UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES HUGHES GORDON,

                Plaintiff,

v.

DR. JEFFREY S. ALLEN, HSU STAFF,
CORPORAL LEYENDECKER,
C.O. DIMMER, and
NURSE R. KLARKOWSKI,

                Defendants.

Case No. 11-CV-847-JPS

ORDER

      The plaintiff, Charles Hughes Gordon, a Wisconsin state prisoner, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. He claims that the defendants were deliberately indifferent to his serious medical needs when he was an inmate at the Brown County Jail. Defendants Dr. Jeffrey S. Allen and Nurse R. Klarkowski have filed a motion for summary judgment and a motion to strike the plaintiff's response. Defendants Corporal Leyendecker ("Leyendecker") and Correctional Officer Dimmer ("Dimmer"), who are represented by separate counsel, have also filed a motion for summary judgment. All of these motions are ready for resolution and will be addressed herein.

1.    SUMMARY JUDGMENT STANDARD

      "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2. FACTUAL BACKGROUND

This section is taken from defendants Leyendecker and Dimmer's Proposed Findings of Fact and defendants Dr. Allen and Nurse Klarkowski's Proposed Findings of Facts. The plaintiff did not respond to the defendants' facts and he did not submit any admissible evidence in response to the defendants' motions. Thus, the defendants' proposed facts are undisputed. *See* Fed. R. Civ. P. 56(c), (e); Civil L. R. 56(b)(2)(B) (E.D. Wis.).

1.1 Defendants Dr. Allen and Nurse Klarkowski's Facts

The plaintiff was detained at the Brown County Jail ("Jail") at all times relevant. He claims that the pain from his sore throat and associated ear and

Page 2 of 15

Case 2:11-cv-00847-JPS   Filed 02/08/13   Page 2 of 15   Document 66

neck pain were not adequately treated and that he was not referred to an emergency room for a better evaluation, nor were any blood tests or cultures of his saliva taken, in violation of his constitutional rights.

Dr. Allen has been licensed as a physician in Wisconsin since 1989 and is board certified in family medicine. He was employed by Health Professionals, Ltd., in August 2011 and provided on-site health care services to inmates at the Jail during all relevant times in this matter. Members of the Health Services Unit ("HSU") at the Jail would prearrange and schedule inmate appointments for Dr. Allen based on written inmate requests for health care. Nurse Klarkowski has been licensed as a Licensed Practical Nurse in Wisconsin since 1980. During all relevant times in this matter, Nurse Klarkowski was employed by Health Professionals, Ltd., and was the health service administrator of the HSU at the Jail. In that capacity, Nurse Klarkowski had access to inmate medical records and charts, including written Inmate Requests for Medical Care ("Medical Slips").

On August 19, 2011, at 10:30 a.m., the plaintiff submitted a Medical Slip to the HSU, which indicated that his "throat [was] swollen" and that he had an "ear ache." In response, the following day at 11:45 a.m., Maureen Nellis, RN, assessed the plaintiff in the HSU and recorded his vitals as follows: (1) temperature 99.1 degrees; (2) blood pressure 120/80; (3) pulse 72; and (4) respirations 16, all of which were within normal limits. Nurse Nellis wrote the following progress note after assessing the plaintiff: "Pt. seen per officer request. Pt. states difficulty swallowing & sore throat. Throat is reddened, inflamed with enlarged tonsils that are red. No white patches noted. Typanic membrane pearly gray. Lungs clear bilaterally." (Klarkowski Decl. ¶ 10, Ex. 1, p. 1.) She also contacted Stephen Cullinan, MD, the on-call doctor, by telephone and explained the findings of her assessment. Based on

her oral report, Dr. Cullinan prescribed the plaintiff Erythromycin 500 milligrams, twice daily for five days.

At 6:30 p.m. the same day, Nurse Nellis assessed the plaintiff for a second time in regard to his complaint of a sore throat. She wrote the following progress note: "Pt. c/o of severe throat pain; oropharynx & tonsils are reddened/inflamed. No white patches noted." (Klarkowski Decl. ¶ 12, Ex. 1, p. 1.) After her assessment, Nurse Nellis contacted Sandy Geister, RN, the on-call triage nurse who worked under the supervision of Raymond Herr, MD, and relayed her findings regarding the plaintiff via telephone. Dr. Herr through Nurse Geister ordered that the plaintiff should receive 600 milligrams of Ibuprofen twice daily for five days. Nurse Klarkowski did not see or assess the plaintiff at any time on August 20, 2011.

On August 22, 2011 at 8:15 a.m., the plaintiff submitted an HSU Medical Slip indicating that he would like salt water to gargle with "due to swollen tonsils." About fifteen minutes later, Patrice Hutzler, RN, responded in writing to the plaintiff by indicating that a salt water gargle had been ordered. Michelle Lara, LPN, also recorded in a separate Medical Progress Note that, based on the plaintiff's complaint of a sore throat, per protocol, a salt water rinse had been ordered twice daily for five days.

At 9:45 p.m. that day, the plaintiff submitted an HSU Medical Slip indicating that the medication he was taking "was not working too good." Nurse Klarkowski responded in writing on August 23, 2011, and indicated that she would schedule him for the next available appointment with the doctor. This was Nurse Klarkowski's first response and/or communication to the plaintiff in regard to his complaint of a sore throat. She scheduled him to see Dr. Allen that same day.

During his August 23, 2011 appointment with Dr. Allen, the plaintiff complained of throat pain for four days, along with ear and neck pain. Upon examination, Dr. Allen recorded in a Medical Progress Note that he had a red palate with small ulcers and swollen lymph nodes, but that his tonsils appeared within normal limits. Dr. Allen did not see evidence of swelling indicating that his airway was compromised or would become compromised in the future in any manner and he did not record any significant findings in regard to the plaintiff's ears or neck. Dr. Allen diagnosed the plaintiff with herpangina, a viral illness that involves ulcers and sores inside the mouth and which can cause a sore throat. At the conclusion of the examination, despite the fact that herpangina is a condition that normally clears up on its own, Dr. Allen prescribed the plaintiff Zovirax, an antiviral medication at a dosage of 800 milligrams, which was to be taken three times daily for five days. He also ordered that the plaintiff should gargle with 30 milliliters of Maalox twice daily for five days in order to help treat his sores and alleviate his pain, and he discontinued the previously ordered salt water rinses because he thought the Maalox gargles would be more effective. Dr. Allen explained to the plaintiff that it might take several days for the antiviral medication to begin working and for the sores to clear up. He also told the plaintiff that, although he had swollen lymph nodes, his tonsils were not swollen and his condition would not compromise his ability to breathe.

Nurse Klarkowski was present during Dr. Allen's August 23, 2011 examination of the plaintiff, but did not provide an assessment or care. Dr. Allen informed Nurse Klarkowski of his diagnosis of herpangina, his opinion that there was there was no evidence of swelling indicating that the plaintiff's airway was compromised or would become compromised, his orders that the

Page 5 of 15

Case 2:11-cv-00847-JPS   Filed 02/08/13   Page 5 of 15   Document 66

plaintiff should receive Zovirax and a Maalox gargle, and that it might take a few days for the medication to begin to work and for his ulcers to heal.

On August 24, 2011, at 12:25 a.m., Leyendecker responded to the plaintiff's complaints of a swollen throat and difficulty breathing. At that time, he contacted Nurse Klarkowski at home via telephone and described the plaintiff's symptoms. Leyendecker reported the plaintiff's vitals to Nurse Klarkowski and told her that he could not hear or observe him having labored or shallow breathing. Based on this report, Nurse Klarkowski instructed to have the plaintiff gargle with Maalox to help relieve his symptoms. The plaintiff attempted to gargle with Maalox but spit it up soon after beginning to gargle. Leyendecker informed Nurse Klarkowski of this via telephone and she then approved the use of an ice pack to be used on the plaintiff's throat area and instructed for him to swallow small portions of warm water to help soothe his throat. Nurse Klarkowski informed Leyendecker that Dr. Allen had diagnosed the plaintiff with herpangina and that Dr. Allen did not believe his ability to breathe was compromised by his condition.

At 6:00 a.m. on the same day, the plaintiff submitted a written Medical Slip to the HSU indicating that he was still experiencing a sore throat and requested an increase in his medication. Nurse Klarkowski responded to the plaintiff in writing that day by reminding him that Dr. Allen had explained that it would take a few days for the antiviral medication to begin working and for the sores to clear up. She informed him that he could request additional Tylenol from the medication cart that was passed around twice daily or purchase additional Tylenol on his own through the Jail canteen supply. Nurse Klarkowski advised that she would have the plaintiff's

Page 6 of 15

Case 2:11-cv-00847-JPS   Filed 02/08/13   Page 6 of 15   Document 66

medications crushed and that he would be provided a liquid diet to facilitate swallowing and eating.

On August 25, 2011, at 12:50 a.m., Leyendecker was notified by another corrections officer that the plaintiff was having the same medical complaints as he had the previous day, but that he was not having any difficulty breathing. Due to the dripping of continued saliva from the plaintiff's mouth, Leyendecker moved him to a medical observation cell with a wheelchair. After he was moved, the plaintiff was able to stand up and walk with minimal assistance. At 1:30 a.m., Leyendecker called Nurse Klarkowski at home and informed her of the plaintiff's complaints of a sore throat and dripping saliva. After he informed her of the plaintiff's vitals and of his observations of the plaintiff, Nurse Klarkowski recommended that he should continue to be monitored in the medical cell throughout the evening. Nurse Klarkowski also scheduled the plaintiff to be seen by an HSU nurse that same day.

Later that same morning, at 9:30 a.m., Nurse Nellis assessed the plaintiff and took his vitals, which she recorded as follows: (1) temperature 97.2 degrees; (2) pulse 65; (3) blood pressure 138/80; and (4) oxygen levels of 98%, all of which were essentially within normal limits. Nurse Nellis also recorded that the plaintiff was spitting up mucus, gagging strongly, and that his throat was inflamed and had ulcers. She had the plaintiff rinse his mouth out with water and instructed him to take frequent sips of ice water. Nurse Lara contacted Nurse Geister and Dr. Herr by telephone that morning with the results of Nurse Nellis's findings. Dr. Herr, through Nurse Geister, ordered the plaintiff's Ibuprofen to be increased in strength from 600 milligrams to 800 milligrams in order to address his complaints of pain.

Nurse Klarkowski did not have contact with anyone, including the plaintiff, regarding his complaint of throat pain after August 25, 2011.

On August 26, 2011, after filing a written grievance, the Jail HSU staff scheduled Dr. Allen to examine the plaintiff in follow-up to his complaint of a sore throat. During the August 26, 2011 appointment, the plaintiff told Dr. Allen that his throat pain had diminished and that he was experiencing minimal pain. He further explained that he was able to eat, did not have any shortness of breath, and did not have any neck or ear pain. Dr. Allen noted that the plaintiff had minimal tonsillar swelling and mild redness of the right side of the soft palate. He determined that the plaintiff's airway was fully intact and that he did not have any swollen lymph nodes. Dr. Allen also observed that he could swallow without any problems, did not appear dehydrated, and did not have any residual ulcers in his mouth. Based upon Dr. Allen's examination and the plaintiff's lack of complaints, Dr. Allen determined that his throat pain and herpangina had resolved. He returned the plaintiff to a normal diet, discontinued the Maalox gargles, and ordered that he could return to the general population. Dr. Allen did not have any further contact with the plaintiff or anyone else in regard to his sore throat after August 26, 2011, and the plaintiff did not file any complaints about throat pain after that appointment.

The plaintiff has not identified as defendants the "HSU Staff" members who allegedly violated his constitutional rights.

2.2    Defendants Leyendecker and Dimmer's Facts

Leyendecker was first made aware of the plaintiff's complaints of difficulty breathing and a swollen throat on August 24, 2011, at 12:25 a.m. The plaintiff indicated that he could not swallow his saliva due to his sore and swollen throat. Leyendecker took his vital readings which showed he

Page 8 of 15

Case 2:11-cv-00847-JPS    Filed 02/08/13    Page 8 of 15    Document 66

had a blood pressure of 143/94, pulse of 120 beats per minute, and oxygen levels of 98%. He observed that the plaintiff kept draining his saliva into a cup instead of trying to swallow it, but did not observe the plaintiff having labored or shallow breathing.

Based on the plaintiff's complaints, Leyendecker called Nurse Klarkowski at home, who advised him to have the plaintiff gargle with Maalox. The plaintiff attempted to gargle the Maalox but spit it up soon after beginning to gargle. Leyendecker notified Nurse Klarkowski of the plaintiff's trouble and she approved an ice-pack to be used on the plaintiff's throat area. She also instructed Leyendecker to have him swallow small portions of warm water to help soothe the throat. Nurse Klarkowski indicated to Leyendecker that the plaintiff had been seen by the HSU doctor who indicated that his throat would be swollen, but not swollen to the point that he would not be able to breathe. Leyendecker gave the plaintiff an ice pack and informed him of what the doctor had said. The plaintiff was also advised that Leyendecker would speak with HSU staff later that morning.

On August 25, 2011, at 12:50 a.m., Leyendecker was notified that the plaintiff was having the same medical complaints as the previous night, but that he was not having difficulty breathing. Leyendecker met with the plaintiff and observed that he was slumped over next to the cell door and had saliva dripping from his mouth onto the cell floor. He did not observe the plaintiff to have labored breathing. Leyendecker took the plaintiff's vital readings which showed his blood pressure was 148/93, he had a pulse of 130 beats per minute, and a 98% oxygen reading. He observed the plaintiff gag three times but not vomit and he wiped saliva away from the plaintiff's mouth. Due to the continued dripping of saliva from the plaintiff's mouth, Leyendecker decided to move him to a medical observation cell. A spit hood

was placed on the plaintiff to prevent saliva from dripping onto the floor or Jail staff. Leyendecker explained to the plaintiff why the spit hood was being placed on him and the plaintiff responded that he understood why.

After the plaintiff was moved into the medical observation cell by wheelchair, the spit hood was removed and he was able to stand up and walk with minimal assistance. Around 1:30 a.m., Leyendecker notified Nurse Klarkowski of the plaintiff's complaints, vital readings, and status and she instructed him to continue monitoring the plaintiff. Leyendecker gave the plaintiff an extra towel to assist with removing saliva from his mouth and informed a lieutenant of his status. Shortly thereafter, Leyendecker received a note that the plaintiff wrote that stated, "I am choking again I need to go to the emergency room now I can barely breathe." An officer informed Leyendecker that the plaintiff appeared okay though he was still spitting into a towel.

The plaintiff pushed the panic button in the observation cell several times later on August 25, 2011, and defendant Dimmer responded each time. The plaintiff continued to complain of difficulty breathing and swallowing to Dimmer during the overnight hours. He was seen by an HSU nurse the next morning, August 26, 2011, by 8:00 a.m. The plaintiff's symptoms began to lessen by 9:30 a.m. on August 26, 2011, and the Jail physician released him from the medical observation cell.

3.  DISCUSSION

   3.1   Motion to Strike

As an initial matter, Dr. Allen and Nurse Klarkowski filed a motion to strike the plaintiff's materials submitted in opposition to summary judgment because the responsive materials are untimely, not supported by any admissible evidence, and drafted by another inmate. In response, the

plaintiff contends that he missed the deadline due to his situation in segregation and that he gave the other inmate permission to draft the document on his behalf.

Although the plaintiff's response was tardy, based on his pro se status and segregation circumstances, the court is inclined to consider the filing. However, as indicated above, he has not submitted any evidence in response to the defendants' motions, and he does not dispute any of the defendants' proposed facts. For these reasons, even if the court considered the filing, it would not affect the court's ruling on this matter. Thus, the defendants' motion to strike will be denied as moot.

      3.2     Deliberate Indifference to a Serious Medical Need Law

The plaintiff's claim arises under the Due Process Clause of the Fourteenth Amendment, which affords pretrial detainees the same protection against deliberate indifference as the Eighth Amendment guarantees to the convicted. *Smith v. Knox County Jail*, 666 F.3d 1037 (7th Cir. 2012) (citing *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007)). Accordingly, when considering a pretrial detainee's claim of inadequate medical care, the analogous standard under the Eighth Amendment is often used. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (citations omitted).

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (internal quotation omitted)). Prison officials violate the Constitution if they are deliberately indifferent to a prisoner's serious medical need. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A prisoner's claim for deliberate indifference must establish: "(1) an objectively

serious medical condition; and (2) an official's deliberate indifference to that condition." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Arnett*, 658 F.3d at 750).

"A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (internal quotation marks and punctuation omitted). The medical condition need not be life-threatening; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

To demonstrate deliberate indifference, a plaintiff must show that the defendants "acted with a sufficiently culpable state of mind," something akin to recklessness. *Arnett*, 658 F.3d at 751 (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Id.* (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Id.* (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It "is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 751 (quoting *Duckworth*, 532 F.3d at 679) (quotation marks omitted).

### 3.3 Defendants Dr. Allen and Nurse Klarkowski's Motion

Dr. Allen and Nurse Klarkowski contend that they are entitled to judgment as a matter of law because they were not deliberately indifferent to an objectively serious medical condition. As indicated, to show that the defendants were deliberately indifferent, the plaintiff needs to establish that they were aware of but intentionally or recklessly disregarded his serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). The court defers to a medical professional's treatment decisions "unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon*, 163 F.3d at 988). The plaintiff points to no evidence which might suggest that defendants' treatment of his symptoms was unreasonable. He was seen promptly by multiple medical professionals regarding his condition and his complaints were taken seriously. The record shows that defendants' treatment of plaintiff was grounded in professional judgment and was reasonable. *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008); *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006). Even if the defendants were wrong in not sending him to the emergency room, as long as they believed that they were providing appropriate treatment, they were not deliberately indifferent. *See Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000). No reasonable factfinder could conclude that Dr. Allen and Nurse Klarkowski were deliberately indifferent to the plaintiff's medical need.

### 3.4 Defendants Leyendecker and Dimmer's Motion

Leyendecker and Dimmer contend that they were not deliberately indifferent to the plaintiff's medical needs. If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in

believing that the prisoner is in capable hands. *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005); *see also Arnett*, 658 F.3d at 755. However, "nonmedical officials can 'be chargeable with…deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Hayes*, 546 F.3d at 525 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Non-medical defendants cannot simply ignore an inmate. *See Greeno*, 414 F.3d at 656 (stating that "[p]erhaps it would be a different matter if [the non-medical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, [defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate].").

Here, Leyendecker and Dimmer did not ignore the plaintiff. Rather, when he complained about his symptoms, they referred him to Jail medical professionals. Twice, Leyendecker called Nurse Klarkowski at home in the middle of the night for guidance with regard to the plaintiff's symptoms and he followed the advice given. There is no indication that either defendant had reason to believe that Nurse Klarkowski or Dr. Allen were mistreating the plaintiff. Accordingly, their motion for summary judgment will be granted. Therefore,

IT IS ORDERED that defendants Dimmer and Leyendecker's motion for summary judgment (Docket #39) and defendants Dr. Allen and Nurse Klarkowski's motion for summary judgment (Docket #48) be and the same are hereby GRANTED and that this action be and the same is hereby

DISMISSED on its merits together with costs as taxed by the Clerk of the Court;

IT IS FURTHER ORDERED that defendants Dr. Allen and Nurse Klarkowski's motion to strike (Docket #60) be and the same is hereby DENIED as moot.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge